**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARYBEL CORTES, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:16–cv–01910 (JCH) |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, Acting | : | MARCH 19, 2018 |
| Commissioner, Social Security | : | |
| Administration, | : | |
| Defendant. | : | |

**RULING RE: MOTION TO REVERSE THE DECISION OF THE COMMISSIONER
(DOC. NO. 21) & MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
(DOC. NO. 26)**

## I.   INTRODUCTION

Plaintiff Marybel Cortes ("Cortes") brings this appeal under section 405(g) of title

42 of the United States Code from the final decision of the Commissioner of the Social

Security Administration ("SSA"), which denied her application for Title II disability

insurance benefits and Title XVI supplemental security income.  See Complaint

("Compl.") (Doc. No. 1).  Cortes seeks either reversal or remand of the Decision

rendered by Administrative Law Judge ("ALJ") Richard A. DiBiccaro, which affirmed the

Commissioner's denial.  See Motion to Reverse the Decision of the Commissioner

("Mot. to Reverse") (Doc. No. 21).  The Commissioner cross-moves for an order

affirming that Decision.  See Motion to Affirm the Decision of the Commissioner ("Mot.

to Affirm") (Doc. No. 26).

For the reasons set forth below, the Motion for Order to Reverse Final Decision

of Commissioner is **GRANTED**.  The Motion for Order Affirming the Commissioner's

Decision is **DENIED**.

## II.    PROCEDURAL HISTORY[1]

Cortes applied for disability and supplemental security income benefits on April 4, 2008, alleging a disability onset date of January 31, 2006.  See Mem. in Supp. of Mot. to Reverse the Decision of the Comm'r ("Pl.'s Mem.") (Doc. No. 21-1) at 1.  The Commissioner denied Cortes's application initially and upon reconsideration.  See id. Cortes requested a hearing with an ALJ, which was held before ALJ DiBiccaro on March 1, 2010.  See id.  On September 24, 2010, ALJ DiBiccaro issued an unfavorable decision for Cortes, affirming the Commissioner's denial and finding that Cortes was not disabled.  See id.  Cortes requested review by the Appeals Court, which denied the request.  See id.  After appeal to this court, the Commissioner moved to voluntarily remand the case under sentence four of section 405(g) of title 42 of the United States Code and judgment entered in Cortes's favor on September 19, 2012.  See id.

Cortes filed subsequent Title II and XVI claims on April 20, 2011, and April 29, 2013, which the Appeals Council consolidated with her earlier claims.  See R. at 524.  A hearing was held before ALJ DiBiccaro on March 18, 2015, followed by a supplemental hearing on June 29, 2015.  See Pl.'s Mem. at 1.  On October 29, 2015, ALJ DiBiccaro issued a second unfavorable decision.  See id.  By notice dated September 20, 2016, the Appeals Council refused to take jurisdiction, making ALJ DiBiccaro's October 29, 2015 decision a final decision reviewable by this court.  See id. at 1–2.  Cortes filed this appeal on November 18, 2016.  See Compl.

---

[1] The procedural history set forth herein is derived from Cortes's Memorandum in Support of Motion to Reverse the Decision of the Commissioner ("Pl.'s Mem.") (Doc. No. 21-1), which the Commissioner adopted "except for any arguments or conclusions contained therein."  See Def.'s Mem. in Supp. of Her Mot. for an Order Affirming the Comm'r's Decision ("Def.'s Mem.") (Doc. No. 26-1) at 1.

## III.     FACTS[2]

Marybel Cortes was born in 1967, making her 50 at the time of this Ruling.  See R. at 75.  The Record in this case begins in 2002, when Cortes sought treatment at Fair Haven Community Health Center ("Fair Haven") for relief from her asthma, back pain, and bilateral carpal tunnel syndrome ("CTS").  See Pl.'s Mem. at 2.  In 2003 and 2004, Cortes continued attending appointments and received prescriptions for medication to help with her depression and anemia, along with her other conditions.  See id. at 3. After Cortes's alleged onset date in 2006, the Record reflects a visit to Fair Haven for treatment for her asthma, followed by a two year gap in the Record during which she lived in Puerto Rico.  See id. at 4.

Cortes's next recorded treatment involved a visit to Community Health Services / Meriden Medical ("CHS") in 2008, where she complained of depression and anemia. See id.  Cortes continued her treatment for severe anemia due to menorrhagia and asthma and also began seeing a psychiatrist at CHS, who diagnosed her with major depression, post-traumatic stress disorder ("PTSD"), and obsessive-compulsive disorder ("OCD").  See id. at  5–6.  Physicians recommended surgery to address Cortes's menorrhagia, but decided to wait for improvements in her asthma and sleep apnea.  See id. at 14.  Cortes finally had a hysterectomy in November 2012.  See id. at 16.

---

[2] Although the court's Scheduling Order required that the parties make a "good faith attempt to stipulate to the facts" (Doc. No. 17), the parties did not file a stipulation of facts.  The Commissioner adopted the facts as set forth in Cortes's brief, "except for any arguments or conclusions contained therein, and as further elaborated in the argument below."  Def.'s Mem. at 2.  The court will rely on the medical chronology in Cortes's brief as if stipulated.

Cortes has struggled with cocaine use, along with abuse of prescription drugs such as Xanax.  See id. at 12, 19.  In November 2014, Cortes was hospitalized at Stonington Institute for addiction to crack cocaine, where she also admitted to being addicted to pain medication.  See id. at 19.  Cortes has attempted suicide four times. See id. at 19.

## IV.    STANDARD OF REVIEW

Under section 405(g) of title 42 of the United States Code, it is not a function of the district court to review de novo the ALJ's decision as to whether the claimant was disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  Instead, the court may only set aside an ALJ's determination as to social security disability if the decision "is based upon legal error or is not supported by substantial evidence."  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  Substantial evidence requires "more than a mere scintilla," but is a "very deferential standard of review."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447–48 (2d Cir. 2012).  It requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 448.  If the Commissioner's findings of fact are supported by substantial evidence, those findings are conclusive, and the court will not substitute its judgment for the Commissioner's.  42 U.S.C. § 405(g) (2016); see also Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).

## V.    DISCUSSION

Cortes argues that ALJ DiBicarro's Decision should be reversed or remanded for four reasons.  First, she argues that the ALJ erred when he did not give controlling weight to the 2009 or 2011 opinions of Cortes's treating physician, Dr. Danielle Butler. See Pl.'s Mem. at 31–34.  Second, Cortes argues that the ALJ improperly evaluated the credibility of Cortes's statements regarding her symptoms.  See id. at 37–39.  Third,

Cortes argues that the ALJ's decision "cherry-picked" the Record, leading to a decision that was not supported by substantial evidence. <u>See</u> <u>id.</u> at 34–37. Fourth, she argues that the vocational expert's testimony was baseless and that the ALJ committed legal error by relying on it. <u>See</u> <u>id.</u> at 24–31.

Cortes does not argue that the ALJ committed legal error by failing to satisfy his duty to develop the record. However, the court cannot ignore the gap in the Record concerning Cortes's treatment for mental illness from February 2015 until the Record closed at the end of July 2015. <u>See</u> R. at 524, 1547. A court will not typically consider a non-jurisdictional issue that a party has failed to raise. <u>See</u> <u>Hardiman v. Reynolds</u>, 971 F.2d 500, 502 (1992). However, the claims process for Social Security benefits is nonadversarial and, on appeal, courts "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." <u>See</u> <u>Moran v. Astrue</u>, 569 F.3d 108, 112 (2d Cir. 2009) (quoting <u>Kohler v. Astrue</u>, 546 F.3d 260, 265 (2d Cir. 2008)). An ALJ commits legal error when he fails to fulfill his affirmative obligation to develop the administrative record. <u>See</u> <u>Rosa v. Callahan</u>, 168 F.3d 72, 80 (2d Cir. 1999). Many courts have found that they may consider errors in benefits determinations that have not been raised. <u>See, e.g.</u>, <u>Farley v. Colvin</u>, 231 F. Supp. 3d 335, 339 (N.D. Cal. 2017) ("In this 'beneficent' and 'tolerant' context, there is no reason to treat the failure to raise an error as reason for actively ignoring it."); <u>Taylor-Tillotson v. Colvin</u>, No. 13-80907-CIV-WM, 2014 WL 7211888, at *13 (S.D. Fl. Dec. 18, 2014) ("A reviewing court may <u>sua</u> <u>sponte</u> address issues in social security cases"); <u>Mangan v. Colvin</u>, No. 12 C 7203, 2014 WL 4267496, at *1

(N.D. Ill. Aug. 28, 2014) (same); <u>Gravel v. Barnhart</u>, 360 F. Supp. 2d 442, 452 n.24 (N.D.N.Y. 2005) (noting additional issues that warrant remand <u>sua</u> <u>sponte</u>).

Upon review of the Record, the court concludes that the ALJ erred by failing to adequately develop the record to obtain treatment notes from the Intensive Outpatient Program ("IOP") Cortes participated in beginning in February 2015, updated Fair Haven records, and records from Cortes's hospitalization at Yale-New Haven Hospital in 2015. The ALJ also failed to develop the record by not requesting a treating physician opinion regarding Cortes's mental illness. Remand is therefore appropriate to obtain the missing records and a treating physician opinion with respect to Cortes's mental illness.

A.   <u>Duty to Develop the Record</u>

1.   Missing Records from Fair Haven, Catholic Charities, and Yale-New Haven

An ALJ in a Social Security benefits hearing has an affirmative obligation to develop the record adequately. <u>See</u> <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999). Although this obligation is heightened where the plaintiff is <u>pro</u> <u>se</u>, <u>see</u> <u>Echevarria v. Secretary of HHS</u>, 685 F.2d 751, 755 (2d Cir. 1982), the "non-adversarial nature" of Social Security benefits proceedings dictates that the obligation exists "even when . . . the claimant is represented by counsel." <u>Pratts v. Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must himself affirmatively develop the record' . . . .") (quoting <u>Echevarria</u>, 685 F.2d at 755). Due to the non-adversarial nature of a Social Security hearing, "[t]he duty of the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" <u>Vincent v. Comm'r of Social</u>

Security, 651 F.3d 299, 305 (2d Cir. 2011) (quoting Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004)).

During the hearing on March 18, 2015, Cortes explained that, after she was hospitalized at Stonington Institute in December 2014, she began receiving treatment three times a week and seeing a clinician one-on-one at an IOP at Catholic Charities. See R. at 1472, 1501–02. ALJ DiBiccaro asked Cortes's counsel, Allan B. Rubenstein, if Cortes's treatment at Catholic Charities was in the Record, to which Attorney Rubenstein replied that he did not have possession of Cortes's medical records after her hospitalization at Stonington. See R. at 1503. Before the close of the hearing on March 18, 2015, ALJ DiBiccaro said: "I want you to have the updated Catholic Charities records and that's important and I think that's everything since November 2014 and that way it'll give you time and there'll be some more individual visits that the claimant will have in the meantime, as well as the group visits." R. at 1512.

By the time of the supplemental hearing on June 29, 2015, Attorney Rubenstein still had not submitted the records from Catholic Charities. See R. at 1518. However, Attorney Rubenstein told ALJ DiBiccaro that he had just received the discharge records from a hospitalization at Yale-New Haven that occurred the prior week. See R. at 1518A. When ALJ DiBiccaro asked for the discharge record, Attorney Rubenstein said he would first need to make a copy of the document because Cortes had only given him the document upon her arrival at the hearing and he did not have a second copy. See R. at 1519. ALJ DiBiccaro told Attorney Rubenstein that he would keep the Record open to allow him to submit the discharge record and the actual records for Cortes's recent hospitalization. See R. at 1520–21, 1547.

ALJ DiBiccaro then asked Attorney Rubenstein if there were any gaps in the Record where there was treatment, but he had not yet submitted documentation. <u>See</u> R. at 1520. The ALJ's seemingly straightforward question gave rise to the following exchange:

ALJ: And are there any records which you're withholding - -

Atty: Excuse me?

ALJ: - - that you haven't submitted? Are there any records which you haven't submitted that you have?

Atty: That's a tough question. I mean, why would I do that?

ALJ: The question is a simple one, are there records which you have that relate to the claimant's treatment that you are - -

Atty: No [sic] as far as I know but, as I said, I can't make an assurance that there has never been a glitch in the receipt of records and what was sent by the providers where, sometimes you'll ask for A and they'll give you A minus four pages and then different pages the next time, that if those pages happen to appear, that somehow one may say then I withheld them.

 I cannot take responsibility for that. I can only say that within the realm of the nature of all the systems, whatever we have we have sent to you. But, even within my office, that different people send things at different times, I can't - - I don't want to be - - have like a strict liability standard based on that and in response to that question - -

ALJ: Yes.

Atty: - - because if I say no, I know that the Agency is being very, very strict and I can't hold to that because I can't feel like I can be responsible for any types of difficulties in any of the stages that were beyond unintentional, by anybody.

R. at 1521–22. The absence of the records the ALJ had requested at the March hearing and counsel's perplexing response to the ALJ's question at the June hearing should have alerted the ALJ to the strong likelihood that there was a gap in the Record.

Ultimately, counsel never submitted the records from Catholic Charities, the Yale-New Haven hospitalization, or FCHC. <u>See</u> R. at 524, 1519.

District courts have come to varying conclusions regarding whether an ALJ fails to fulfill his duty to develop the record when he relies upon plaintiff's counsel to obtain records, but plaintiff's counsel fails to do so. <u>See</u> <u>Corona v. Berryhill</u>, No. 15-CV-7117 (MKB), 2017 WL 1133341, at *14 (E.D.N.Y. Mar. 24, 2017) (collecting cases). Multiple district courts have found that, in light of the investigative nature of the ALJ's duty to develop the record, the ALJ's obligation is not satisfied when he permits the record to close without counsel having submitted records that the ALJ knows are missing. <u>See</u> <u>Carr v. Comm'r of Soc. Sec.</u>, 16 Civ. 5877 (VSB)(JCF), 2017 WL 1957044, at *10 (S.D.N.Y. May 11, 2017) ("[T]he ALJ has an 'affirmative' duty to develop the record that is 'independent' of the plaintiff's duty to provide evidence."); <u>Corona</u>, 2017 WL 1133341, at *16 (finding the ALJ did not satisfy his duty to develop the record where ALJ took no action to ensure the record was complete beyond discussing missing treatment notes with counsel on the record and leaving the record open for submission of the records where ALJ was aware the request had been outstanding for two months before the hearing); <u>Glast v. Astrue</u>, No. 11-CV-5814, 2013 WL 5532696, at *10 (E.D.N.Y. Sept 30, 2013) ("That the ALJ requested information from Plaintiff's attorney regarding two treating physicians and received nothing does not relieve the ALJ of his duty to fully develop the record.") (citations and internal quotation marks omitted); <u>Harris v. Colvin</u>, No. 11-CV-1497, 2013 WL 5278718, at *7–*8 (N.D.N.Y. Sept. 18, 2013) (finding the ALJ did not satisfy the duty to develop the record where the ALJ held the record open to allow the plaintiff's counsel to obtain the promised additional records but no records

were submitted); but see Jordan v. Comm'r of Soc. Sec., 142 Fed. App'x 542, 543 (2d Cir. 2005) (unpublished) (affirming a district court's finding that an ALJ fulfilled his duty to develop the record where plaintiff's counsel volunteered to secure the records, the record was left open, the ALJ reminded plaintiff's counsel to submit the records, plaintiff's counsel informed the social security administration that there were no further records to add, and plaintiff's counsel did not request assistance from the ALJ in obtaining the records); Myers ex rel. C.N. v. Astrue, 993 F. Supp. 2d 156, 162–64 (N.D.N.Y. 2012) (finding the ALJ fulfilled the duty to develop the record where the plaintiff's counsel requested and received additional time to submit certain evidence, but submitted different evidence).

These cases reflect what is a very specific, record review of the context of the failure to develop the record. Based on the record before this court, see, supra, at 6–8, and given the critical importance of the missing records to the ultimate issue, this court concludes the ALJ did not satisfy his duty to develop the record.

Without the missing medical records, there is scant evidence in the Record regarding Cortes's anxiety, OCD, and depression. Cortes saw Dr. Richard Feuer at CHS beginning in June 2008, see R. at 1165, but stopped seeing him in March 2010, see R. at 1079. She received Xanax at Fair Haven in 2013, but as one doctor noted in his treatment notes, "despite multiple referrals and discussions regarding the need for psychiatric evaluation patient will not go." R. at 1325. The medical records generated from Cortes's participation in the IOP at Catholic Charities could be critical to substantiating or contradicting Cortes's testimony about her mental illness.

In addition, treatment notes from Fair Haven reference an MRI of Cortes's lumbar spine, but there is no MRI in the Record.  <u>See</u> R. at 1329.  Although the Record remained open until July 31, 2015, <u>see</u> R. at 1547, the treatment notes from Fair Haven end on January 8, 2015, <u>see</u> R. at 5, 1333.  Attorney Rubenstein did not submit the results of an MRI or discussion of the results in updated treatment records, which could have been critical to substantiating Cortes's complaints of chronic back pain.  <u>See</u> R. at 1329.

Counsel should have obtained the records himself as Cortes's representative.  However, given ALJ DiBiccaro's awareness of the missing records and counsel's non-responsiveness at the supplemental hearing, the court concludes that the ALJ did not satisfy his duty to develop the record by relying solely on counsel.  <u>See</u> <u>Pratts</u>, 94 F.3d at 37.

2.   Treating Physician Opinion with Respect to Cortes's Mental Health

Despite Cortes's detailed testimony about the symptoms of her mental illness and her long, <u>albeit</u> spotty, history of receiving psychiatric treatment, the only medical source statement regarding Cortes's mental health is dated in 2009.  <u>See</u> R. at 415–17.  Dr. Cindy Avila, who conducted the evaluation, does not appear to have had a treating relationship with Cortes outside of the evaluation she conducted to complete the report.  The Record does not contain any treatment notes from Dr. Avila and her responses reveal limited knowledge of Cortes's condition beyond what Cortes reported when Dr. Avila prepared her evaluation.  In response to the question "Identify the factors . . . that support your assessment," Dr. Avila wrote, "Pt. reports being sensitive to noise and is irritable.  Also some symptoms of OCD."  R. at 416.  In response to the question "Are any other capabilities affected by the impairment," Dr. Avila wrote, "This clinician does

not have enough information to determine that." Id. Accordingly, ALJ DiBiccaro gave Dr. Avila's opinion little weight. See R. at 536.

The expert opinions of a treating physician are of particular importance to a disability determination. See Hallet v. Astrue, No. 3:11-cv-1181, 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (concluding that "[b]ecause the expert opinions of a treating physician as to the existence of a disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician" and remanding for further development of the record); Tirado v. Astrue, No. 10-CV-2482 (ARR), 2012 WL 259914, at *4 (E.D.N.Y. Jan. 25, 2012) (finding that the affirmative duty to develop the record "includes the obligation to contact a claimant's treating physicians and obtain their opinions regarding the claimant's residual functional capacity.") "The ALJ's duty to develop the record is enhanced when the disability in question is a psychiatric impairment." Lacava v. Astrue, No. 11-CV-7727 (WHP)(SN), 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012); see also Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 268 (S.D.N.Y. 2016) (quoting Merriman v. Comm'r of Soc. Sec., No. 14-CV-3510 (PGG)(HBP), 2015 WL 5472934, at *19 (S.D.N.Y. Sept. 17, 2015) ("The duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace."); Gabrielson v. Colvin, No. 12-CV-5694 (KMK)(PED), 2015 WL 4597548, at *4 (S.D.N.Y. July 30, 2015 (citing cases).

Given the information the ALJ had regarding Cortes's sessions with counselors at Catholic Charities, the ALJ erred by not requesting a treating physician opinion.

Before Cortes's participation in the IOP at Catholic Charities, there was no physician from whom the ALJ could have requested such an opinion.  Cortes's unwillingness to receive treatment from a psychiatrist led to the situation where, despite a long period of taking Xanax for her mental illness, Cortes had not established a relationship with a treating physician.  <u>See</u> R. at 533.  However, at the Catholic Charities Intensive Outpatient Program, there likely would have been a physician who could have submitted a treating physician opinion, in addition to generating treatment notes, which could have been submitted.  Thus, in addition to failing to follow up on the medical records from Catholic Charities, the ALJ failed in his duty to develop the record by not inquiring as to whether Cortes was seeing a physician at Catholic Charities who could provide a treating source statement and treatment notes.

      B.    <u>Additional Issues</u>

In light of the court's decision to remand this case on the issue of the ALJ's duty to develop the record, the court need not reach the merits of Cortes's other claims.  However, having reviewed the Record and Cortes's arguments, as well as the Commissioner's responses, the court addresses Cortes's other claims.

      1.   Treating Physician Rule

SSA regulations give the opinions of treating physicians "controlling weight," so long as those opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. § 416.927(c)(2); <u>see also</u> <u>Lesterhuis v. Colvin</u>, 805 F.3d 83, 88 (2d Cir. 2015).  In other words, "the SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."  <u>Burgess v. Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008)

(quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)). "Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" Tankisi v. Comm'r of Social Sec., 521 F. App'x 29, 33 (2d Cir. 2013) (Summary Order) (quoting Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988)).

The ALJ declined to give controlling weight to either of Dr. Danielle Butler's medical source statements. See R. at 535. Cortes argues that there is nothing in the Record that calls into question Dr. Butler's opinions. See Pl.'s Mem. at 34. The Commissioner argues that the portions of Dr. Butler's opinions that the ALJ did not credit are inconsistent with the objective medical evidence. See Def.'s Mem. at 6–8.

In her 2009 opinion, Dr .Butler found that Cortes could occasionally lift or carry up to 10 pounds. See R. at 354. She opined that Cortes was able to sit for 30 minutes, stand for 15 minutes, and walk for 10 minutes uninterrupted. See R. at 355. Dr. Butler determined that, over the course of an eight hour work day, Cortes would be able to sit for a total of four hours, stand for a total of one hour, and walk for a total of one hour. See id. Dr. Butler stated that Cortes required the use of a cane to walk and that, without a cane, Cortes could not use her free hand to carry small objects due to wrist pain. See id. Dr. Butler indicated that Cortes was limited to frequent reaching and occasional handling, fingering, feeling, and pushing or pulling with either hand. See R. at 356. She was occasionally able to operate foot controls with either foot. See id. Dr. Butler opined that Cortes was occasionally able to climb stairs and ramps, never able to climb ladders or scaffolds, occasionally able to balance, and never able to stop, kneel, crouch, or

crawl.  <u>See</u> R. at 357.  Finally, Dr. Butler stated that Cortes is able to tolerate occasional dusts, odors, fumes, and pulmonary irritants and moderate noise.  <u>See</u> R. at 358.

In her 2011 opinion, Dr. Butler found that Cortes could occasionally lift or carry up to 10 pounds.  <u>See</u> R. at 912.  Dr. Butler opined that there were no limits on Cortes's ability to sit uninterrupted, but that she was limited to less than 20 minutes of standing or walking without interruption.  <u>See</u> R. at 913.  In addition, Dr. Butler determined that Cortes could sit for a full eight hour day, but that she could only stand or walk less than 20 minutes over an eight hour work day.  <u>See</u> R. at 913.  Dr. Butler again stated that Cortes required a cane to ambulate and that she could not use her free hand to carry small objects.  <u>See</u> <u>id.</u>  Dr. Butler opined that Cortes was limited to frequent reaching, handling, and feeling with either hand, occasional fingering, and no pushing as a result of her carpal tunnel.  <u>See</u> R. at 914.  Cortes was never able to operate foot controls with either foot.  <u>See</u> <u>id.</u>  Dr. Butler stated that Cortes was occasionally able to climb stairs and ramps, never able to climb ladders or scaffolds, and never able to balance, stoop, kneel, crouch, or crawl.  <u>See</u> R. at 915.  Dr. Butler determined that Cortes was never able to be exposed to dust, odors, fumes, and pulmonary irritants due to her asthma. <u>See</u> R. at 916.

ALJ DiBiccaro based his decision not to afford either of Dr. Butler's opinions controlling weight on the lack of support for her opinions in her treatment notes.  <u>See</u> R. at 535–36.  The ALJ stated that, "[n]othing in Dr. Butler's treatment notes indicate [sic] why the claimant could only stand and walk for 1 hour or would be unable to perform <u>any</u> posturals."  R. at 535.  In addition, the ALJ found that "[t]here is no discussion in the treatment notes of any difficulty using her hands at that time."  <u>Id.</u>  Further, the ALJ

stated that "at least some of her report is based on the claimant's own subjective reports." Id. With respect to the 2011 opinion, the ALJ stated that he "does not find support for occasional fingering." Id.

Dr. Butler's 2009 and 2011 opinions—consisting only of checkboxes without any explanations—left the ALJ to speculate as to why Dr. Butler believed Cortes would have difficulty performing posturals or using her hands. See R. at 535. It is a close question whether the ALJ should have contacted Dr. Butler for clarification. See Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) (noting that before relying on a "remarkably vague" treating physician's opinion that contradicted claimant's testimony, "[a]t a minimum, the ALJ likely should have contacted [the treating physician] and sought clarification of his report."); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) (The physician's "failure to include this type of support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical.") Because the court is remanding on the basis of the ALJ's failure to develop the record, it need not decide whether the ALJ's decision not to seek more information from Dr. Butler constituted legal error. However, on remand, the ALJ should request that Dr. Butler, if available, clarify the basis for her findings given the lack of objective medical evidence supporting her opinion.

Although the Record does not contain objective medical evidence of Cortes's physical impairments—such as an x-ray or MRI results of a condition that would limit Cortes to scarcely any standing or walking, or diagnostic testing for Cortes's CTS—it was not entirely accurate for the ALJ to state that there was no support for such

limitations.  See R. at 532, 535.  Cortes complained of back pain at multiple appointments with Dr. Butler.  See R. at 1065, 1096, 1121, 1123.  After Dr. Butler's evaluation, Cortes continued to complain of lower back pain at Fair Haven in 2013 and 2014.  See R. at 1316, 1326, 1329.  In addition, the ALJ did not address Cortes's persistent complaints to her physicians about numbness in her hands.  See R. at 425.

In addition, an updated treating physician opinion would clarify the role of Cortes's anemia in the limitations Dr. Butler assessed.  Cortes's anemia appears to have improved following her hysterectomy in November 2012, which postdated Dr. Butler's opinions.  See R. at 1020.  The ALJ noted that there was no indication of ongoing fatigue or limitations after Cortes's hysterectomy in November 2012.  See R. at 532.  This statement also is not entirely accurate, as Cortes continued to seek care for her anemia in 2013 and 2014 at Fair Haven.  See R. at 1314, 1328.  However, it seems that her symptoms were far less severe than before the hysterectomy and that her visits were predominantly for asthma and other respiratory ailments, see R. at 1313, 1321.  To the extent Cortes's anemia formed the basis for any of Dr. Butler's findings, Cortes's improved condition may obviate the need for some of the limitations Dr. Butler selected in her opinion.

In part because Dr. Butler's opinion did not indicate why she found certain limitations, the ALJ made the broad assertion that Dr. Butler's opinions were not supported by the medical evidence, rather than specifying what evidence conflicted with Dr. Butler's opinions.  See R. at 535–36.  After finding that Dr. Butler's opinions were not entitled to controlling weight, the ALJ was still required to consider several additional factors before assigning a value to the opinion.  See Halloran v. Barnhart, 362 F.3d 28,

33 (2d Cir. 2004) (the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.")  For example, the ALJ did not explain how the length of Dr. Butler's treating relationship with Cortes bore on the weight he gave her report.  See 20 C.F.R. § 404.1527(c) (listing factors including the frequency of examination and the length, nature and extent of the treatment relationship; the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion).  On remand, the ALJ should apply the factors to be considered when the treating physician's opinion is not given controlling weight, especially in the light of any additional information obtained from Dr. Butler.

### 2.  Credibility

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted).  The ALJ must follow the two-step process set forth in the regulations for evaluating a claimant's assertions of pain and other limitations.  See id.  "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."  Id. (citing 20 C.F.R. § 404.1529(b)).  Second, "the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' in the record."  Id. (quoting 20 C.F.R. § 404.1529(a)).

Cortes argues that the ALJ erred by finding that her dishonesty about her drug use at the hearings implicated her credibility when there was no evidence to suggest Cortes lied. See Pl.'s Mem. at 37–38. In addition, Cortes argues that the ALJ discounted her testimony about the pain she experiences even though none of Cortes's treating physicians suggested that she was misrepresenting her pain. See id. at 38–39. The Commissioner argues that the ALJ appropriately relied on Cortes's dishonesty with respect to her drug use, reported earnings, and her history of larceny. See Def.'s Mem. at 11–12. The Commissioner also argues that the ALJ appropriately considered Cortes's lack of mental health treatment and her continued smoking despite her asthma and the effect her asthma had on her ability to undergo a hysterectomy. See id. Finally, the Commissioner argues that the ALJ took into account Cortes's testimony regarding her back pain. See id. at 13.

ALJ DiBiccaro found that Cortes's failure to seek mental health treatment or stop smoking to treat her asthma and permit her to undergo a hysterectomy for her anemia undercut her credibility. See R. at 535. Under SSR 96-7p, an ALJ may find that a claimant's statements are less credible "if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." However, before drawing an inference, the ALJ must consider "any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Id. The ALJ did not apply SSR 96-7p when reviewing Cortes's lack of mental health treatment, see R. at 533, and her smoking addiction, see R. at 531. On

remand, it is recommended that the ALJ consider any explanation Cortes may have had for her failure to comply with referrals for psychiatric treatment and smoking cessation recommendations. See Goff v. Astrue, 993 F. Supp. 2d 114, 128–129 (N.D.N.Y. 2012) (remanding for consideration of plaintiff's efforts to quit smoking or the explanations contained in the record regarding her difficulties in following through on her physician's advice); Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 352 n.12 (E.D.N.Y. 2010).

The ALJ also found that conflicting accounts Cortes made regarding her work activity after the alleged onset date, multiple pending cases for shoplifting, and dishonesty at the hearing about her use of illicit substances and to her physicians about her Xanax prescriptions diminish her credibility. See R. at 534–35. Courts "show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Suarez v. Colvin, 102 F. Supp. 3d 552, 578–79 (S.D.N.Y. 2015) (quoting Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013)). However, unlike the Ninth Circuit, where the matters considered in credibility determinations are broader and include "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statement concerning the symptoms, and other testimony by the claimant that appears less than candid," see Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen v. Chater, 80 F.3d 1273 at 1284 (9th Cir. 1996)), the case law in this Circuit does not extend beyond the substance of the regulations and claimant's demeanor at the hearing, see Genier, 606 F.3d at 49 ("The ALJ must consider 'statements the claimant or others make about his impairment(s), his

restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.'") (brackets omitted) (quoting 20 C.F.R. § 404.1512(b)(3)).

The regulations direct the ALJ's attention to inconsistencies in the evidence relating to the claimant's alleged disability, not to her character generally. While courts defer to the ALJ's ability to view a claimant's demeanor, this consideration relates to how a claimant testifies regarding her symptoms, not to collateral issues such as criminal behavior or reputation for truthfulness.

Because the court is remanding on the basis of the duty to develop the record, it need not determine whether the ALJ's formation of a credibility determination on the basis of Cortes's dishonesty is legal error. However, it is suggested that, on remand, the ALJ analyze Cortes's credibility based on statements or actions relating to her physical and mental impairments.[3] In addition, on remand, the ALJ's credibility analysis should take into account any additional information derived from the updated records.

### 3. Selective Review of the Evidence

Cortes argues that the ALJ "cherry picked" unfavorable evidence and ignored favorable evidence. See Pl.'s Mem. at 34–37. She argues that the ALJ emphasized

---

[3] The Commissioner issued a new Social Security Ruling, SSR 16-3p in March 2016 eliminating the use of the term "credibility" in order to clarify "that subjective symptom evaluation is not an examination of an individual's character." Acosta v. Colvin, 15 Civ. 4051, 2015 WL 6952338, at *18 (S.D.N.Y. Nov. 28, 2016) (quoting S.S.R. 16-3p, 2016 WL 1119029, at *1). The Commissioner republished S.S.R. 16-3p in October 2017 with a revision explaining that "our adjudicators will apply SSR 16-3p when we make determinations and decisions on or after March 28 2016 . . . . If a court remands a claim for further proceedings after the applicable date of the ruling (March 28, 2016), we will apply SSR 16-3p to the entire period in the decision we make after the court's remand." SSR 16-3p, 2017 WL 5180304, at *1.

that she was smoking 20 cigarettes a day, even though that single episode was a departure from the far more frequent reports of around three to five cigarettes a day. See id. at 35. In addition, Cortes argues that the ALJ made the unjustified conclusion that Cortes's hysterectomy was postponed for several years because of her continued smoking. See id. at 35–36. Cortes also argues that the ALJ ignored Cortes's diagnosis of bilateral carpal tunnel syndrome ("CTS") when he declined to credit Dr. Butler's opinion that Cortes was limited to occasional fingering. See id. at 36–37. Further, Cortes argues that the ALJ ignored Cortes's prescriptions for a cane and a rolling walker with a seat, and neglected to mention Cortes's obesity, OCD, back pain, or chronic pain syndrome. See id. at 37.

The Commissioner argues that the lack of mention of a 2002 diagnosis of CTS is of no consequence because the ALJ considered the 2008 diagnosis of CTS, described treatment notes relating to CTS, and considered Cortes's complaints about her problems using her hands. See Def.'s Mem. at 7. In addition, although the ALJ could not identify the medical basis for Cortes's need for a cane, he indicated the need for an assistive device in Cortes's RFC. See id. at 7. Further, the Commissioner argues, the ALJ was not obligated to consider Cortes's obesity because Cortes did not show that her obesity caused any additional limitations to her functioning. See id. at 8. The Commissioner notes that the ALJ considered Cortes's OCD in formulating his RFC when he limited her to only frequent interaction with supervisors, co-workers, and the public. See id. at 9–10.

"Cherry picking" is the practice of considering unfavorable evidence to the exclusion of signs of more extensive limitations. See Dowling v. Comm'r of Soc. Sec.,

No. 5:14-CV-0786 (GTS/ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015) ("The fundamental deficiency involved with 'cherry picking' is that it suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both.") Cortes does not indicate whether her cherry picking argument is a challenge to the ALJ's application of the treating physician rule or credibility determination, or if it indicates that the ALJ's decision was not supported by substantial evidence overall. See Pl.'s Mem. at 34–37.

The ALJ noted a record stating that Cortes smoked 20 cigarettes in a day. See R. at 531. However, he described other records indicating that Cortes smoked two to three cigarettes a day or half a pack a day. See id. Ultimately, the ALJ drew the conclusion that Cortes's continued smoking despite her respiratory issues implicated her credibility. See R. at 535. The ALJ's determination that Cortes's surgery was postponed because of her smoking was based on all of the evidence describing her smoking, not simply the one time she reported smoking 20 cigarettes in a day. See R. at 531. While any implication for Cortes's credibility should be reevaluated using the appropriate credibility regulation, see, supra, p. 19, the ALJ's finding that Cortes's smoking delayed her surgery is supported by substantial evidence, see R. at 1341 ("She does smoke cigarettes and this is probably the main issue"); R. at 1339 (noting that asthma and sleep apnea were concerns for surgery).

The ALJ also appropriately evaluated Cortes's claim of CTS. Having mentioned the 2008 diagnosis and other aspects of Cortes's CTS, the ALJ did not need to mention her 2002 diagnosis. See Wider v. Colvin, 245 F. Supp. 3d 381, 386 (E.D.N.Y. 2017) ("An ALJ's findings may properly rest on substantial evidence even where he or she

fails to 'recite every piece of evidence that contributed to the decision, so long as the record permits [the Court] to glean the rationale of [his or her] decision.'") (quoting Cichocki v. Astrue, 729 F.3d 172, 178 n.3 (2d Cir. 2013)).  In addition, while the ALJ was unable to determine the basis for Cortes's need for an assistive device, he incorporated this limitation into her RFC.  See R. at 532.

Further, the ALJ did not err by not discussing Cortes's obesity.  "[W]here the record contains evidence indicating limitation of function due to obesity, the ALJ must consider the effect of obesity on the claimant's ability to do basic work activities at steps two through four of the sequential evaluation process."  Browne v. Comm'r of Soc. Sec., 131 F. Supp. 3d 89, 102 (S.D.N.Y. 2015) (quoting Battle v. Colvin, 2014 WL 5089502, at *5 (W.D.N.Y. Oct. 9, 2014)).  "Conversely, the ALJ's obligation to discuss a claimant's obesity alone, or in combination with other impairments, diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a significant factor in relation to the claimant's ability to perform work related activities."  Id. (quoting Farnham v. Astrue, 832 F. Supp. 2d 243, 261 (W.D.N.Y. 2011)).  Various treatment notes mention Cortes's weight, see R. at 1036, 1206, but there is no evidence in the Record showing how obesity would limit Cortes's ability to work.  See generally Britt v. Astrue, 486 Fed. App'x 161, 163 (2d Cir. 2012) (ALJ did not err in finding that obesity was not a severe impairment where the claimant "did not furnish the ALJ with any medical evidence showing how the [ ] alleged impairment[ ] limited his ability to work"); Mancuso v. Astrue, 361 Fed. App'x 176, 178 (2d Cir. 2010) (ALJ did not err in review of obesity where "there [was] no factual basis for thinking that 'any

additional and cumulative effects of obesity' limited [the claimant's] ability to perform light work") (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00Q).

Additionally, Cortes argues that the ALJ failed to address her OCD, back pain, and chronic pain syndrome. See Pl.'s Mem. at 37. However, the ALJ discussed Cortes's testimony regarding her OCD symptoms and her treatment with Dr. Feuer before arriving at an RFC that limited Cortes to "frequent interaction with supervisors, co-workers, and the public, and to routine and repetitive tasks that require less than 30 days to learn" based on her various mental health issues, including her OCD. See R. at 534. After considering the updated records and any additional treating physician opinion on Cortes's mental illness discussed under the ALJ's duty to develop the record, see, supra, pp. 8–12, the ALJ will be able to reevaluate any effects of Cortes's OCD on her ability to work. The ALJ also considered Cortes's back pain and chronic pain syndrome, but found that they did not support greater limitations than the RFC he assigned Cortes due to the lack of objective medical evidence. See R. at 532. The ALJ should reevaluate Cortes's complaints of back pain and chronic pain on remand in the context of any further information he receives from Dr. Butler and after reassessing Cortes's credibility.

### 4. Vocational Expert

Cortes argues that the vocational expert's testimony was not supported by substantial evidence because his methodology for determining the number of jobs available to Cortes was unreliable. See id. at 24–30. The Commissioner argues that the vocational expert adequately described the sources for his testimony and that more specific information was not needed for the ALJ to credit the vocational expert's testimony. See Def.'s Mem. at 16.

"[A] vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally." McIntyre v. Colvin, 758 F.3d 146, 152 (2d Cir. 2014) (citing Brault v. Soc. Sec. Admin., 683 F.3d 443, 450 (2d Cir. 2012)). The ALJ may credit a vocational expert's testimony when it is "given on the basis of the expert's professional experience and clinical judgment" and is "not undermined by any evidence in the record." Id. Here, like in Brault, the vocational expert testified to the sources he relied on: the "Dictionary of Occupational Titles" (the "DOT") published by the United States Department of Labor, the Standard Occupational Classification System ("SOC") produced by the Department of Labor's Bureau of Labor Statistics, and his own knowledge of the labor market. See R. at 1532–33.

Cortes questions the reliability of the vocational expert's methods by pointing to the mathematical impossibility of his calculations. See Pl.'s Mem. at 28–29. The vocational expert found jobs that Cortes could perform based on her RFC using the position descriptions in the DOT. See R. at 1532. Because the DOT does not report how many jobs are available in the economy, the vocational expert looked to comparable SOC codes, which contain job statistics. See R. at 1533. The vocational expert then used his knowledge and experience to extrapolate the number of jobs from the SOC code back to the DOT code for the positions he found suitable for Cortes. See R. at 1532. For example, using this methodology, the vocational expert testified that there were 120,000 persons employed as an Addresser, which is one of eight positions listed under the SOC code for Word Processors and Typists. See R. at 1531. However, the May 2014 Occupational Employment Statistics—the most current

publication at the time of the supplemental hearing—reports that total national employment for all eight occupations listed under SOC 43-9022.00—Word Processors and Typists—was 81,300.  See R. at 868.

By exposing the vocational expert's flawed calculations, Cortes has illustrated the dubious methodology used to arrive at the number of jobs in the economy.  However, the vocational expert need not provide the exact number of jobs available for a position. See Brault, 683 F.3d at 450.  In addition to the position of Addresser, the vocational expert testified that Cortes could perform the jobs of Monitor and Document Preparer, among other positions.  See R. at 1531.  Thus, while this defect in the expert's testimony is troubling, the court concludes that ALJ DiBiccaro's determination that jobs Cortes could perform existed in significant numbers in the national economy was supported by substantial evidence.

## VI.    CONCLUSION

For the reasons stated above, the Motion for Order Reversing the Commissioner's Decision is **GRANTED**, and the Motion for Order Affirming the Decision of the Commissioner is **DENIED**.  The case is remanded to the ALJ for proceedings consistent with this Ruling.  The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the District Judge who issued this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 19th day of March, 2018.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

27